In re DEMAREST et al.

In re PENNSYLVANIA R. CO.

(District Court, E. D. New York. March 9, 1898.)

1. NEGLIGENCE—PERSONAL INJURIES—MOVING BARGES.
    Where a barge was being removed from one wharf to another, by a rope, in a careful and customary manner, and a passing tug, not knowing that a rope was being used, caught it in its wheel, and carried it away with such suddenness that a boy on the barge became entangled in the coil, and his leg broken, neither party is at fault.

2. SAME—DANGEROUS PREMISES—CHILDREN.
    The rule that the owner of dangerous premises or machinery is guilty of negligence in allowing young and inexperienced persons to come and remain within the influences of such danger applies only where the injury complained of resulted from a danger commonly incident to the premises, and the owner is not required to use affirmative care in guarding the child from a danger arising entirely from extraneous causes.

Wing, Shoudy & Putnam, for Augustus Demarest.
Robinson, Biddle & Ward, for Pennsylvania R. Co.
William S. Lewis, for respondent.

THOMAS, District Judge. The barge Wetherel, chartered by the Pennsylvania Railroad Company, was lying at the Commercial Wharf, in Atlantic Basin, Brooklyn, May 24, 1893. Otto Nilsen, then of the

age of ten years and about four months, and his brother, of the age of seven years, Norwegians, resided with their parents in Brooklyn. They had been in this country for about four months, and neither read nor spoke the English language. On the morning of the above date, the boys were sent to school; but finding, as they claimed, the school gates closed, they, while returning home, were attracted to the wharf where the barge was lying, and asked the mate, one Nansen, also a Norwegian, dead before the trial, if they could go aboard the same. Pursuant to his consent, they did go aboard, and remained until lunch hour, when they went home, returned after lunch, again went on the barge, and remained there until after the accident in controversy. Erickson, captain of the barge, a Norwegian, states that in the forenoon he directed the mate to send the boys ashore, and that in the afternoon he in person gave a similar order, which was obeyed, and that thereafter he did not know that the boys were on the barge until the immediate time of the accident. The boys deny that they were ordered from the barge by any one, but rather that they were encouraged by the mate, and suffered by the captain, to remain, and their statement in this particular, in connection with other circumstances, is preferable. About 3 o'clock the barge was removed from the Commercial Wharf to a parallel wharf some 200 feet distant, and known as "South Central Pier," about opposite the end of which the barge was lying. The barge, while at the Commercial Wharf, was headed in a northerly direction, while at some 10 feet from its stern was a coal boat. The manner of changing the position of the boat was as follows: One end of a rope, coiled at a spot towards the bow of the barge, was passed over the railing on the starboard side thereof, and carried to the stern of the coal boat, and fastened. Thereupon Erickson, with a boat hook, pushed the stern of the barge from the wharf, and, then seizing the rope, began pulling upon the fastening on the coal boat, at the same time backing towards the bow of the barge. This drew the bow of the barge to a position approximately at right angles to the Commercial Wharf, and gave her sternway in the direction of the South Central Pier. This impetus having been attained, Erickson ordered the mate, then on the coal boat, to cast off the line fastened thereon, which he did; and Erickson dropped his hold on the line, went towards the stern to grapple his boat hook upon the South Central Pier, which by this time the barge had approached to within some 10 feet. The line thus released trailed over the starboard side of the barge near the bow, falling into the water at an angle of some 45°, while the end detached from the coal boat fell into the water, by which it was covered. At this moment, the tug Defiance, coming into the Basin from the East river to take a boat lying southerly of the barge, for which purpose it was necessary to pass the same, was rounding South Central Pier, from the end of which the barge was not far distant.

Erickson testified that he called out to the captain of the tug, who was in the pilot house, as follows: "I have got a line out. Look out for it;" or, "Captain of the tug, I have got a line across there;" but did not call at that instant upon the captain to stop. It appears that Erickson called out in this manner, not in expectation of any danger

to the boy, but to save his line from being cut or picked up by the tug. The captain of the tug testifies that he did not see the line, and that it was not in view; and the conclusion is warranted that, as the line passed from the barge to the water on the starboard side, it was not fairly in the sight of the captain of the tug. The captain of the barge states that the line was floating in the water, but whether it was on the water or in such a condition as to be seen he is not able to state. The injured boy and his brother state that the line was just above the water, but it is apparent that their judgment upon the matter, even if they have any memory, is not reliable, and that their recollection of the details of the movement of the barge and of the position of the line is inaccurate, however much they may have intended to speak truly concerning them. The captain of the tug also states that he did not hear the warning given by Erickson, nor any warning whatsoever, until he had passed the lighter, when he heard somebody say, "Look at the boy!" When Erickson saw that there was danger of the tug taking up the line, he went hurriedly forward of the mast, where the boys were standing, which was near the winch, and two or three feet from the coil of rope according to his statement. It was his intention to pull the line in. He states as follows: "I told him [the injured boy] to get out of the way, and, as soon as I made a grab for the rope, it went out all of a sudden. This was caused by the tugboat picking it up in her wheel." He states that he then looked behind, and saw the boy tangled up in the rope and tried to clear him, but he could not; and that he got hold of the brake on the winch, and held on until the last turn around his leg broke the boy's leg behind the bitt, which is forward of the winch. The evidence of the boys was that, when the tugboat was near the rope, Erickson called out for the tugboat to stop, and that then Erickson came over, and said to "look out," and then he let the line out quicker, and the injured boy stepped aside, and into the circle of the rope, which was at his left, and that the coil of rope pulled the boy around a couple of times, and caught him up, and brought him against the side of the boat, and caused the injury, and that thereafter Erickson caught him in his arms, and tried to cut the rope with an ax. Their evidence is that the bow of the tugboat had just touched the rope as Erickson called out.

It is obvious from these facts that no fault attaches to the Defiance whereupon liability for the accident may be based. The case does not fall within the facts present in Clark v. Koehler, 46 Hun, 536. See Banks v. Railway Co., 136 Mass. 485.

The only question remains as to the liability of the barge. It is claimed by counsel for the respondent that the barge is guilty of negligence in two particulars: First, in allowing the boys to come and remain upon the barge; and, second, in obstructing the waterway with the rope. As to the last claim, it appears that the Basin was not a public water, except for such boats as were privileged to use the same, and that the means employed to send the barge from the wharf to the pier were quite customary, and there is nothing to indicate a negligent exercise of this usual right. The more serious question arises as to the neglect of the captain of the barge

and the mate in allowing the boys to spend the day upon it, concerning which the rule is invoked that the owner or person in charge of dangerous premises or machinery is guilty of negligence in allowing young and inexperienced persons to come and remain within the influences of such danger. It is urged also, in the present case, that those in charge of the barge expressly or impliedly invited the children to remain on the barge, and that the owner is liable to the same extent as if the invitation had been directly extended by itself. The authorities respecting these contentions are familiar, and need not be cited nor reviewed. But was the place one of danger? Did those in charge do or omit any act constituting negligence? Erickson testifies that he sent the boys away because it was dangerous for them to remain, and that one of them had, in the earlier part of the day, been struck on the shoulder by the handle of the winch, which was the immediate cause of his ordering them off, and that he regarded it as a pretty dangerous place for the boys to be. If the injury had occurred from any danger commonly incident to the boat or the navigation thereof, or from the misbehavior of those in charge, this opinion of the captain might have weight in connection with other circumstances in determining the liability of the barge. But the injury arose from a circumstance quite removed from any danger ordinarily or reasonably to be expected from the presence of the boys upon the barge, or the changing of the position thereof; nor did it arise from the active misconduct of the captain or mate. The only possible ground for charging culpable negligence relates to the nonfeasance of Erickson when actual peril arose from which the accident resulted. The subject may be discussed from such standpoint.

The boys were on the barge by the consent of those in charge of her. If it must be held that those in charge were not so related to the cause of the accident as to make the petitioner liable, yet when there appeared a sudden, unexpected, and unusual condition, and one dangerous to the children if brought within its influence, did Erickson then do or omit to do any act that resulted in creating such liability? In other words, if it must be held that the fact that the lads were near the coil of rope, amusing themselves perhaps by handling the line, while the boat was being shifted, did not show negligence on the part of Erickson, yet when the latter discovered that the rope was, or was likely to be made, fast to the tug, whereby it would be rapidly uncoiled and carried out, did the relation that he had allowed to exist between the boys and the boat require him to do any affirmative act looking to their safety? The proposition is this: Two children, one ten and one seven years of age, have been allowed to come upon a barge lying at a wharf near a public street, and play thereon for several hours, and finally to stand near and handle a coil of rope used in slowly moving the barge. Suddenly a passing tug takes up the rope, and carries it rapidly out. The captain in charge of the barge, having come hurriedly up, tells the boys to get out of the

way, takes the rope, and gives them no other attention. In yielding their position to him, one of them steps into the coil, is caught by it, and injured. A place not dangerous, by an unexpected event, and one for which those in charge of the barge were not responsible, becomes dangerous; because it cannot be doubted that, when this rope began to go out rapidly, the situation was one of peril to children of tender years. If Erickson thought the barge in itself was a dangerous place, there was every reason for his appreciating that the danger was greatly increased. He then knew, or should have known, that these children, in proximity to this coil, were in a position where injury might come. No threatened injury to the barge or the line appeared, which demanded Erickson's immediate and undivided attention, or necessarily diverted it from the children, or at least forbade the exercise of some protection or care in their behalf. There is no evidence that he paid the slightest attention to the removal of the children from their perilous position, or that he gave them any instructions, or did any act even remotely directed towards their security. On the other hand, he came rapidly forward, told them to get out of the way, took hold and began to handle the line. He wished to occupy the position in which the children were, and, while the respondent was taking another position, he stepped into the coil. Through Erickson's sufferance, the boys were in a position which unexpectedly became dangerous for the children. He desired them to stand aside from that position, that he might occupy it. How they did it does not seem to have been a matter of care to him. Let us make an illustration: Some machinery is not in motion, and some curious children are standing near it, by the sufferance of the owner's servants. From a cause for which the owner was not responsible, the machinery is set in motion, and the children thereby are placed in a dangerous situation, and the person in charge comes hurriedly to the spot, and orders the children to get out of the way, occupies their place, and one of them, in getting out, is injured. Has the person done his duty to the children? The question is new in this feature: That, while the petitioner is not responsible for the cause of danger, he permits children of a tender age to be on his premises; and, when the danger appears, he orders them hurriedly aside, without the exercise of any affirmative care for their safety in obeying the command. The fact that he does not create the danger does not, from a moral standpoint at least, excuse care, when it does appear, towards a child within the action of the perilous agency. Erickson should not have contented himself with ordering him away, but should have given some heed at least to the manner of the child's escape from the perilous surroundings. And yet the fault of Erickson was simply that of nonfeasance in the face of a danger for which he was in no wise a responsible agent. His mere omission to take charge of the child does not seem to have such causal connection with the injury as would make the petitioner liable. Erickson personally did not do what a careful and considerate man should have done; but such omission seems to bear

rather upon his exercise of a personal humanity than upon a legal duty which the petitioner owed to the respondent, and which was to be fulfilled by its agent in charge of the barge.

The owners of premises and machinery have been declared responsible for the exposure of the same under such circumstances as to attract children, as well as for the misconduct of their servants in the treatment of children, and even adults, who were by the invitation of such servants, or without any sanction whatsoever, in places over which such servants had control. There seems, however, to be no authority or principle that sanctions a holding that the owners of premises or appliances, whether acting through themselves or others, are legally required to use affirmative care to guard a child from a danger not incident to the locus in quo, arising without culpable fault of their own, but entirely from extraneous causes.. Were such authority or principle present, there would be no hesitation in awarding damages to the respondent; but, in the absence of such legal justification, the conclusion necessarily results that there must be a decree for the petitioners, relieving them from liability, and granting the relief prayed for in the petition.